UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| DAILEY | CIVIL ACTION NO. 10-1453 |
| VERSUS | JUDGE JAMES J. BRADY |
| SHREVEPORT, ET AL | MAGISTRATE JUDGE DOCIA L. DALBY |

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

The matters before the Court are: (1) a Motion For Summary Judgment filed by defendants, the City of Shreveport ("the City") and Henry Whitehorn ("Whitehorn"), individually and in his official capacity as the Chief of Police for the City of Shreveport Police Department [Rec. Doc. 29] against plaintiff, Kevin Strickland ("Strickland"), Strickland's Memorandum in Opposition [Rec. Doc. 37], and the City and Whitehorn's Reply thereto; and, (2) a Motion For Summary Judgment filed by defendant, Henry Whitehorn, individually and in his official capacity as the Chief of Police for the City of Shreveport Police Department [Rec. Doc. 30] against plaintiff, Chad Dailey ("Dailey"), Dailey's Memorandum in Opposition [Rec. Doc. 35] and Whitehorn's Reply thereto [Rec. Doc. 40].[1]  Federal question jurisdiction exists under 28 U.S.C. § 1331.  For the reasons that follow, the City and Whitehorn's Motion against Strickland will be GRANTED and Whitehorn's Motion against Dailey will be GRANTED.

---

[1]  This Memorandum Ruling addresses both Motions for Summary Judgment in consolidated cases 10-cv-01453 and 10-cv-01853 as plaintiffs' causes of action originate from the same events, the underlying facts apply to both cases and the claims against the defendants are virtually identical.

## *FACTUAL BACKGROUND*

Whitehorn was appointed Chief of Police for the Shreveport Police Department ("Police Department") in August, 2007. At that time, SPD General Order 305.05, the written order regarding interdepartmental transfers, provided a method of identifying a base of candidates from which to select personnel for the transfer. The selection process included ranking candidates by interviewers based on subjective criteria, and the process resulted in a numerically ranked list of applicants, providing that the highest ranked person would be selected. *R. 30-3, Exh. A, Aff. Of Whitehorn, ¶ 3; Exh. B, June 6, 1994 SPD 305.05.* SPD 305.05 also provided that "[t]he Chief of Police retains the right … to assign members otherwise as the needs of the department dictate." *Id.* A Chief of Police also retains the right to modify general orders at his or her discretion and such orders become effective immediately regardless of whether a formal revised copy of the general order is issued and placed in the handbook. *R. 30-3, Aff of Whitehorn, ¶¶ 4-5.*

On December 15, 2009, Whitehorn formally modified SPD 305.5 to provide that a vacant position would be filled by the Chief of Police from a list of the top scorers after consideration of recommendations from his command staff. *Id., Exh. 1, December 15, 2009 SPD 305.5.* Whitehorn indicated that the modification was done because he was concerned that the general order regarding transfers favored officers who had previously served in specialized positions, was discouraging new personnel from seeking and obtaining vacant positions and that the same officers were being "recycled" in and out of specialized units within the Police Department. *Id., Exh. 1, Aff Of Whitehorn, ¶ 4; Exh. C. Aff. Of Huddleston, ¶ 3.* The revised general order was used

before the document setting forth those changes was completed, including when a white male was selected for a vacant position in the training academy even though he did not have the highest score or ranking. *R. 30-1, Statement of Undisputed Facts, ¶2.*

Approximately one year prior to modification of the SPD 305.5, on January 16, 2008, a meeting of the SPD Enrichment Panel was conducted by Whitehorn with elected personnel representatives, including Corporal Tim Adgate, the patrol representative. *R. 44-1, 01/16/2008 Enrichment Meeting Minutes.* The minutes of the meeting indicate that a variety of topics were raised by the representatives, including a "Rumor about Diversification" raised by Adgate that "[p]eople are hearing [Whitehorn] talk about diversification and it causes concerns because most people feel the most qualified should get the job." *Id.* The minutes further provide Whitehorn's response:

> Chief advised that diversity is important. He will not overlook anyone because of race and he wants qualified people in the positions. There are people who are just as qualified as the individuals selected for these positions and in some cases, people have chosen not to apply because they didn't feel they were wanted in some of these positions because of past history. He wants to ensure we are not overlooking someone who is just as qualified that is a minority, whether it is black or female. The department should reflect the society we live in. We may not see 100 percent, but when he has the opportunity to have diversity in the divisions with qualified people, he will do that. Chief advised that he will not be the only one doing the selecting and that we would not have a reserve [sic] good old boy system.

*Id.*

On December 17, 2009, a meeting was held in which several selections were made for transfers, including a vacant position for the Violent Crimes Unit in the Investigations Division. Whitehorn's "command staff" attended the meeting to assist

him in selecting persons for the positions.[2]  *Id., ¶ 3.*  Following an oral interview of all candidates by a five person interview board and using the procedures outlined in the modified SPD 305.5, the top candidates were placed on a list.  *Id., ¶ 4.*  Before the list was given to Whitehorn, he indicated that he was interested in Officer Shannon Hicks for the vacant position in the Violent Crimes Unit in the Investigations Division because she was a former Captain in the U.S. Army Reserves and had proven leadership qualities.  Referring to the list of candidates for the Violent Crimes Unit, the command staff expressed concern about Hicks because she had a low ranking and was eighth on the list.  *Id., ¶ 5.*  Because the first individual on the list was no longer available for the position, the next candidates, in numerical order, were: (1) plaintiff, Chad Dailey with a score of 89.6, who was assigned to the Canine Unit at that time; (2) Kevin Strickland with a score of 87.6, who was presently assigned to the Patrol Division but had previously worked in specialized units, including the Investigations Division, and had been removed from one unit for inappropriate conduct; and (3) Shaunda Holmes, with a score of 86.8, who had never been in a specialized unit.  *Id., ¶¶ 6-10.*  After Whitehorn reviewed the list, he stated that he had chosen Shaunda Holmes for the position which was effective January 1, 2010.  Dailey was subsequently chosen to fill a vacant position in the Violent Crimes Unit effective May 1, 2010, and Strickland was chosen to fill a vacant position in the unit effective June 1, 2010.

Plaintiffs, Chad Dailey and Kevin Strickland, Caucasian males, filed actions against the City of Shreveport, Whitehorn, and Cedric Glover, the Mayor of Shreveport,

---

[2] The "command staff" included Assistant to the Chief Duane Huddleston, Assistant Chief Wayne Smith, Assistant Chief Travis Hayes, Assistant Chief Cheryl Jeter Cox, and Assistant Chief Robert Dowell.

on August 21, 2010 and December 17, 2010, respectively, alleging that they suffered racial and sexual discrimination due to the Police Department's policy of giving preferential treatment to African Americans and African American females when Whitehorn selected Holmes for transfer to the Investigations Division. *R. 1; R. 8.*[3] Plaintiffs allege that Whitehorn's discriminatory policy violated their right to equal protection under the Fourteenth Amendment to the United States Constitution pursuant to Title 42 U.S.C. § 1983, and constituted intentional discrimination in violation of La. R.S. 23:332 and La. Const. Art. 1, § 3. *Id.* Strickland also alleges that Whitehorn's actions violated Title VII, 42 U.S.C. § 2000e-2, and that the City is liable for maintaining a policy that violates the equal protection standards of the Fourteenth Amendment. Plaintiffs seek compensatory damages for lost wages and benefits as well as attorney's fees. In particular, plaintiffs contend that Whitehorn's decision to transfer Holmes to the position created a delay in their transfers into the Investigations Division, that is, Dailey contends that he suffered the loss of $3,800.00 in overtime compensation during the 4 month delay and Strickland contends that he suffered the loss of $760.00 in overtime compensation during the one month delay. Defendants oppose plaintiffs' allegations and submit that their claims should be dismissed with prejudice.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment carries the burden of demonstrating that there is an absence of

---

[3] Both plaintiff voluntarily dismissed Mayor Glover with prejudice on April 3, 2012. *R. 28, 21.* The Court entered judgment in favor of plaintiff, Chad Dailey, and against defendant, City of Shreveport, on January 17, 2011. *R. 11.* Plaintiff Kevin Strickland's action against the City of Shreveport remains.

evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, as it does here, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although this Court considers the evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the non-moving party. *Celotex*, 477 U.S. at 322.

### *ANALYSIS*

#### <u>DAILEY AND STRICKLAND'S DISCRIMINATION CLAIMS</u>

Plaintiffs claim that impermissible considerations, namely race and sex, motivated Whitehorn's decision to award Holmes the transfer to the Investigations

Division in violation of the Equal Protection Clause under § 1983. "To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.' " *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir.2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir.2001) (per curiam)). When the plaintiff is asserting claims of intentional discrimination, § 1983 and Title VII provide parallel remedies. *Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 166 (5th Cir.2007)). "The summary-judgment test for discrimination claims made under the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 is the same as the test for discrimination claims under Title VII." *Patel v. Midland Mem'l Hosp. and Med. Ctr.*, 298 F.3d 333, 342 (5th Cir.2002). Further, Louisiana's anti-discrimination statute, La. R.S. 23:332, is "substantively similar" to Title VII and both the federal and state law discrimination claims rely on the same analysis. *See McCoy v. Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007). The same is true for plaintiffs' discrimination claims under La. Const. Art. 1, § 3. *Alleman v. Louisiana Dept. of Economic Development*, 698 F.Supp.2d 644, 665 (M.D.La.,2010). Accordingly, the Court will examine all of plaintiffs' claims of race and gender discrimination under the standards of Title VII as follows.

**TITLE VII ANALYSIS**

In order to withstand summary judgment Title VII requires that plaintiffs, using direct or circumstantial evidence, "present sufficient evidence for a reasonable jury to conclude ... that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.' " *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (U.S. 2003) (quoting 42 U.S.C. § 2000e-2(m)). Direct evidence of discrimination can negate the need for proving discriminatory purpose with the *McDonnell Douglas* test. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047–48 (5th Cir.1996) ("Generally, a plaintiff proves a prima facie case through a four-element test that allows an inference of discrimination."). "Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir.2005). It "includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Fabela v. Socorro Ind. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir.2003) (citations omitted), overruled on other grounds by *Smith v. Xerox Corp.*, 602 F.3d 320, 328 (5th Cir.2010).

Plaintiffs claim the deposition of Corporal Tim Adgate constitutes direct evidence that Whitehorn intended to use race as one of the criteria for transfer into the Investigations Division. *R. 35-1, ¶ 2,3*. In his December 7, 2011 deposition, Adgate was questioned about his attendance at an Enrichment Panel meeting in which "issues were addressed … concerning racial or gender diversity in the department." *R. 36, 12/7/2011 Depo. Of Adgate, p. 28*. Adgate could not recall the approximate date of the

meeting nor who else was present at the meeting.  Adgate was able to recall, however, that he asked Whitehorn about the existence of a diversification plan at the meeting and that Whitehorn told him the following: "he's going to diversify the department.  There's not enough blacks on the department in certain divisions and he's going to see to it that everything is equally devised, that we put enough blacks in each division."  *Id., p. 29*.  Adgate further stated that upon asking Whitehorn more about the diversification plan, "[h]e said, there's not enough blacks in there, I'm going to put them in there."  Finally, Adgate stated in his deposition, "I said, if I test for a position and a black officer tests for the position, I have seniority, more experience, better knowledge, and I score higher on the test than the black office, you're still going to put him in that position?  Yeah.  If there's not enough blacks in there I'll put him in there."  *Id., p. 30*.

The Court finds that Adgate's testimony of Whitehorn's intent to implement a "diversification plan" for certain divisions of the Police Department does not prove "without inference or presumption" that Whitehorn's selection of Holmes was motivated by discrimination.  *Jones*, 427 F.3d at 992.  Nor does it "sho[w] on its face that an improper criterion served as a basis" for the decision.  *Fabela*, 329 F.3d at 415.  Adgate's testimony makes no reference to any particular employment actions actually taken or decisions made by Whitehorn.  Instead, it generally refers to Whitehorn's concern for diversity in the Police Department.  The record indicates that Whitehorn discussed his intent to implement a diversification plan to establish diversity in the investigations bureau within 6 months after his confirmation as Police Chief in August of 2007, over one year before the transfer at issue occurred.  Thus, any finding that the transfer at issue was motivated by race requires an inference that Whitehorn created

and implemented a diversification plan, that the plan was discriminatory, and that plaintiffs' alleged delays in transfer were the result of discrimination. *See, e.g., Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir.2000) (company plan to "identify ... younger managers ... for promotion to senior management ... ultimately replacing senior management" was not direct evidence of age discrimination because it required the inference that senior managers were to be fired in order to make room for younger trainees, rather than being replaced as they retire, change jobs, or are terminated for performance reasons); *see also, Gaalla v. Brown*, 460 Fed.Appx. 469, 480 (5th Cir. 2012) (unpublished) (while memo was "clearly derogatory," it made no reference to any specific employment actions or decisions and did not constitute direct evidence of discrimination); *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (finding that supervisor's statement that three African-American candidates would receive promotions did not constitute direct evidence).

Even assuming that Whitehorn stated his intent to implement a "diversification plan" for certain divisions of the Police Department, plaintiffs offer no evidence to support their contentions that they were victims of Whitehorn's diversity policy. Plaintiffs cannot create an issue of material fact simply by stating their own unsubstantiated beliefs that the diversity policy lead to the delay in their transfers. *See Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). Consequently, Adgate's testimony constitutes only circumstantial evidence of discrimination and the

Court must analyze Dailey's claims under the *McDonnell-Douglas* burden-shifting framework.[4]

Where, as here, there is no evidence of direct discrimination, a plaintiff must first present a prima facie case of discrimination. See *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir.2007). "A prima facie case is established once the plaintiff has proved that [he] (1) is a member of a protected class; (2) was qualified for her position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class." *Lopez v. Martinez*, 240 Fed.Appx. 648, 649 (5th Cir. 2007) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)).

Upon establishing a prima facie case, the burden then shifts to the defendant to set forth a legitimate non-discriminatory explanation for the adverse employment decision. *McDonnell Douglas*, 93 S.Ct. at 1824. The burden is one of production and not persuasion. It cannot, therefore, involve a credibility assessment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). If the employer sustains its burden, the plaintiff's prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either that the employer's proffered reasons are merely pretextual and "unworthy of credence." *Reeves* at 143 (quoting *Tex. Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Once a Title VII claim reaches the pretext stage, the only question remaining for summary judgment purposes is "whether there is a conflict in

---

[4]

substantial evidence to create a jury question regarding discrimination." *Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir.2000).

Defendants assert that plaintiffs cannot establish a *prima facie* case of discrimination because a lateral transfer does not constitute an adverse employment action. While the denial of a "purely lateral transfer" is not an adverse employment action, *see, e.g. Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir.1999), a decision not to transfer an employee may be actionable if it amounts to the "objective equivalent" of the denial of a promotion - that is, if the position sought was "objectively better" than the position originally held. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 614 (5th Cir.2007). To determine whether the new position is objectively better, the fact finder considers a number of factors, namely whether the position entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious. *Id.* The inquiry is objective and "neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion." *Id.*

Citing *Alvarado*, plaintiffs argue that a transfer to the Investigations Division of the Police Department is a "promotion in authority" rather than a lateral transfer. In *Alvarado*, a law enforcement officer sued the Texas Department of Public Safety ("DPS"), alleging that she had not been appointed to the Texas Rangers because of her

gender. *Alvarado* at 609-10. The panel discussed whether or not the denial of a transfer, as opposed to the denial of a promotion, could qualify as an adverse employment action. *Id.* at 612–15. Concluding that a transfer *may* qualify, the panel listed a number of factors to consider: whether the new position (1) comes with an increase in compensation or benefits; (2) means greater responsibility or better job duties; (3) provides greater opportunities for career advancement; (4) requires greater skill, education, or experience; (5) is obtained through a competitive selection process; and (6) is objectively more prestigious. *Id.* at 614 (emphasis in original).

Defendants argue that the Rangers' position sought by the plaintiff in *Alvarado* "is simply not comparable to a position in the Investigations Division of the Police Department." The Court agrees. Here, the evidence indicates that although a vacant position in the Investigations Division is filled through a competitive selection process, it is not an "elite" position that holds additional prestige with the Police Department. *R. 40, Aff. Of Huddleston, ¶ 6; Aff. Of Whitehorn, ¶ 9.* While plaintiffs concede that the Investigations Division position would not have resulted in a salary increase, they contend that the position requirements of working flexible hours, including after-hours and weekends, and the burdensome time commitments away from one's family could convince a jury that the position is "more prestigious" than working as a patrol officer. They further contend that the position creates "functional authority" over all other officers, because such an officer "has the power to tell higher ranking officers to get out of his crime scene." Rather than creating a more prestigious position, the Court finds that these requirements are "idiosyncratic reasons" that may create a subjective preference for the position in some employees. *See, Alvarado* at 614.

Moreover, neither plaintiff alleges he was denied a transfer to the Investigations Division. Instead, each contends that he suffered a delay in transfer. Dailey contends that he should have received the transfer given to Holmes effective January 1, 2010 rather than the transfer he received on May 1, 2010, four months later. Strickland contends that because Dailey should have received the transfer effective January 1, 2010, he should have received the transfer given to Dailey on May 1, 2010 rather than the transfer he actually received on June 1, 2010, one month later.

The Fifth Circuit recognizes that a mere delay in transfer or promotion without loss of compensation is not an "ultimate employment decision" actionable under Title VII. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir.1998) (finding that a delay in promotion was not an adverse employment action where the plaintiff received the promotion with retroactive pay and seniority); *Bouvier v. Northrup Grumman Ship Systems, Inc.*, 350 Fed.Appx. 917, 922 (5th Cir. 2009) (delay of official transfer to crane operator position was not an adverse employment action). *See also*, *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (alleged one-month delay in transfer was not an adverse employment action where duties, responsibilities, compensation and benefits remained the same).

Strickland concedes that a transfer from patrol to investigations does not provide an increase in rank or compensation. *R. 29-3, Exh. E., Ans. To Interrog. Nos. 5, 9*. Dailey does not dispute that the base salary, benefits, and rank of the Investigations Division job were the same as his old position. Rather, plaintiffs allege that they have lost benefits in the form of "overtime compensation" due to the transfer delays. *R. 1, ¶8*. The record establishes that there is equal opportunity to earn overtime compensation in

each division and the amount of overtime that can be earned varies for each pay period depending on the particular circumstances at a particular time. *R. 29, 30, Aff. Of Whitehorn,* ¶ *10; Aff. Of Huddleston,* ¶ *7.* Dailey argues, however, that he "can prove" he would have earned more overtime working in Investigations than he earned in the Canine Unit. *R. 35.* In a sworn statement dated April 25, 2012, Dailey states that by using his overtime rate and the number of overtime hours Holmes would have been required to work during the first few months of her appointment, which is publically available information, he "was able to estimate" that he would have earned approximately $3,800 in overtime. *Id., R. 36, Exh. 7.* Dailey provides no support for this contention and has not submitted the "public records" he used to calculate his alleged overtime loss. In turn, Strickland's only support for the $760 in overtime losses he claims is Dailey's alleged calculations. *R. 37.* Plaintiffs' purely speculative claims for overtime compensation fail to amount to an adverse employment action.[5]

For purposes of proving a prima facie cause of discrimination, a tangible, adverse employment action is defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *La Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 481 (5th Cir. 2002) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). The Fifth Circuit has defined an adverse employment action as a change that makes one's job "objectively worse." *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 770 (5th Cir.2001). Based on the

---

[5] Nor does the Sworn Statement of James E. Cromer provide more than his own unsupported opinion that a homicide detective provided more overtime opportunities than other positions.

foregoing, plaintiffs cannot establish that they suffered an adverse employment action as a result of Whitehorn's selection of Holmes or because of their respective delays in being transferred to the Investigations Division. Accordingly, defendants' motions for summary judgment as to plaintiffs' claims under Title 42 U.S.C. § 1983, La. R.S. 23:332, La. Const. Art. 1, § 3 and Title VII will be granted.

### **STRICKLAND'S CLAIM AGAINST THE CITY OF SHREVEPORT**

In his Complaint, Strickland alleges that "[t]he City's discriminatory policy violated Plaintiff's right to equal protection, as guaranteed to him under the Fourteenth Amendment to the United States Constitution. The policy discriminated against Plaintiff on the basis of his race and sex." *R. 1, ¶ 16*. A municipality such as the City of Shreveport cannot be held vicariously liable for the constitutional violations of its employees; to recover, Strickland must demonstrate that the City maintained an official policy or custom of discrimination. *Monell v. Department of Social Services*, 436 U.S. 658, 692-96 (1978); *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir.1986). As the Court has found that plaintiffs cannot establish a claim of discrimination as the result of Whitehorn's actions, Strickland's claim against the City must be dismissed.

### *CONCLUSION*

Based on the foregoing, the Court will GRANT the Motion for Summary Judgment filed by Henry Whitehorn and the City of Shreveport against plaintiff Kevin Strickland [Rec. Doc. 29] and the Motion for Summary Judgment filed by Henry Whitehorn against plaintiff Chad Dailey [Rec. Doc. 30] and plaintiffs' claims are

dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on September 6, 2012.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**